Mr. Lopez was born into dire poverty in Mexico. He endured unspeakable physical and sexual abuse as a child. He came to the United States at age 14 and lived a law-abiding life. He lived a law-abiding life from age 14 to 21. At age 22, he had the misfortune to encounter corrupt Rampart law enforcement officers, who first of all asked him to deal drugs for him. When he refused, they arrested him wrongly. He was convicted based on perjured testimony and wrongly convicted. Ultimately, the Rampart scandal came to life and he was released, but for Mr. Lopez Arquelao, the damage was almost irreparable. He went into a downward spiral of drug addiction and depression from which he never fully recovered. That resulted in convictions for dealing drugs and for a bar fight. In 2005, he found himself in deportation proceedings. In those proceedings, no one told him that in 2000, Congress had enacted a Victims Act, the purpose of which was to offer protection to immigration crime victims in keeping with the humanitarian interests of the United States. Counsel, at the time of that 2005 deportation proceeding, what was the status of the U visa program? You mentioned the 2000 Act, but it's my understanding that implementation of that took years. So at the time of this deportation proceeding, the program was not fully developed in a way that it might be available to your client. Isn't that correct? That's correct, Your Honor. But even the memos that the government relies upon state that the act was effective upon enactment. That was the law. The Victims Act was the law. And presumably, it's true that there were no regulations in force. Presumably, since that was the law of the land, either he could have obtained a continuance in order to pursue the relief when the regulations were ultimately enacted two years later. He could have retained some sort of relief in immigration court, or he could have pursued some sort of equitable or administrative procedures act to get what was his right under the law. But wasn't the Yates memo was part of the process that they had to go through, right? I mean, that was what was the development of this whole U visa. People had to refer to the Yates memo. Is that correct? That's correct, Your Honor. Okay. And I'm just curious because I understand everything you're saying with respect to this If I recall, the Yates memo also referred only to deferred action as an interim remedy and said that non-citizens convicted of aggravated felonies were not eligible for deferred action. And wasn't Mr. Lopez-Arquelo? Didn't he fit into that category? Well, we have two responses. First, we're arguing that instead of deferred action, he was not eligible for it. But there were other remedies that we're arguing such as continuances or stays that could have been granted by the IJ, excuse me, for when the regulations were ultimately enacted. And secondly, we're arguing that the Yates memo was inconsistent with the law so that there was some sort of administrative procedures act remedy against the inconsistency with the memoranda and the law itself, which clearly allows aggravated felonies. When you say the law, what law are you talking about? I'm sorry. I'm talking about the act itself. That was passed later. That was passed in 2000. And then you have a series of memoranda culminating in 2005. You're ultimately talking about the obligation of the IJ to inform your client of his apparent eligibility for a program that seems to be shrouded in uncertainty. The notion that a claim under the Administrative Procedure Act might have been available to challenge these administrative memos that it issued. That may all be true, but how does that inform the obligation of an IJ at that deportation proceeding to inform your client of the availability of this U visa program? I understand, Your Honor. First of all, I want to say the law is clear. And the act, I'm sorry, the act is clear. And under the act, he's clearly eligible. So then you get to the point is what has this court held an IJ's obligation is? And this court has very expansively interpreted an IJ's due process obligations. Recognizing that immigrants are ignorant of the law. They don't have any legal protection. They may, I'm sorry. I just need you to slow down just a little bit. Are you saying under the act, he was clearly, you used the word clearly eligible? Yes. Well, we're content. He met all the requirements. There was evidence in the record. It's in the briefs and I don't want to go into in detail, but all the evidence was in the record that he was eligible. And aggravated felons, which he was, are not excluded from relief under the statute. And in the Rosulio case, there's a declaration from an expert who says that this is one of the most forgiving standards of relief. That that expert had seen multiple cases where aggravated felonies and crimes had been waived because this act is enacted in the humanitarian interest of the United States. But didn't he admit to being in the U.S. without being admitted or paroled? Yes. That's a separate argument. I know. I'm just kind of, I know you're making that argument. So, but in terms of whether or not the IJ had an obligation to tell him about the U visas, what we're talking about. And so I'm just trying to figure out if the IJ really had a duty to inform him if he had an aggravated felony, he had admitted to being into the U.S. without being admitted or paroled, and he was removable because he didn't have permission. And I wanted to ask you about that too, because I think you argued that Mr. Lopez was lawfully president in the United States, but he was removal hearing because of this letter that the U.S. attorney had sent him. Is that right? Is that your argument? That is a separate argument, separate from this due process contention under 1326D, but that is another argument that we're using. But I'm trying to figure out what meaning we should attach and what significance we should attach to the language that he was to surrender for removal on demand. It seems like that's not insignificant because the government apparently demanded Lopez's surrender when it served its notice to appear. So what's your response to that? No, I agree, Your Honor. I think that's a separate issue and it's not our primary issue, but I think that, especially in light of the current status of the Dacon law, that would not be our primary argument. Our primary argument would be that the IJ had an obligation. This inform the aliens because they may not have lawyers because they're not entitled to a government paid representation. How do you advise someone in the position of your client of the apparent eligibility for a program that is not even in existence? Is it your notion that because at least the statute gave you some idea of what the ultimate regulations would look like, that the IJ should have, on his or her own, granted a continuance to your client until those regulations were fully in place? Is that what the IJ should have done? Yes, Your Honor. I think that once the statute is enacted and he's clearly eligible under the statute, this court has very expansively interpreted the IJ's due process obligations to inform the alien of relief for which they may be eligible. And I'd like to reserve some of my time if there are any further questions. All right. Thank you, Counsel. Thank you. Good morning, Your Honors. May it please the Court. Allison Westfall, Comms, for the United States. At the time the defendant was deported in 2005, no U visas were being issued. And in fact, none were issued until 2008. And the regulations implementing the 2000 statute were not issued, and those did not come out until 2007. What was happening to the people who were eligible for that relief before the regulations were actually issued? I don't know what was happening in immigration court as to whether judges were kind of aware of the memoranda, but there were these three memoranda, and individuals were able to apply for interim relief, which was ultimately centralized at the Vermont Service Center. And at the time of Mr. Yates' 2005 hearing, he would have been eligible to apply to the Vermont Service Center for interim relief, right? Well, I don't think he would have been because of the fact that he was an aggravated felon at that time. So under the Yates memo, the Vermont Service Center could not assess deferred action to aggravated felons. Now, what does deferred action mean in the context of the Yates memo? I think it would mean that the United States, in its discretion, would hold off deportation proceedings. And how would they do that? Through stays of removal, permitting people to have temporary work permits. So you're saying deferred action encompasses every possible relief? I think there is a specific definition of deferred action. Unfortunately, I don't know all of the specific ramifications, but I do know that it does stave off a removal proceeding temporarily. Well, as of this defendant's removal hearing in 2005, what was the status, I guess, of the federal investigation of the Rampart scandal? I think it was largely over by that point, Your Honor. The civil lawsuits, I believe, all resolved around 2001. There were two federal criminal cases, both of which had pled guilty years before 2005, and those were the only federal criminal cases that were brought. And so I think that that also demonstrates the lack of plausibility as to his ability to get a waiver of inadmissibility. He was inadmissible based on a number of grounds, including his controlled substance convictions and his unlawful presence in the country. And so to even get a U visa, he would have to first get a waiver of inadmissibility from USCIS, and it would have to be considered in the national or public interest. And so given that the investigation had largely ended, given that there's no indication that he ever actually met with anybody from a law enforcement agency, and given that he did have quite a serious criminal history, if you look at the years just preceding his deportation proceedings, between 1998 and when he ends up in immigration custody in 2004, I don't think he can demonstrate that it was plausible. And so the court could alternatively find that he wasn't prejudiced by the immigration judge's failure to advise him regarding the U visa. So I guess the government's position would be that there's neither a due process violation nor prejudice. Kind of going back to due process, in addition to the fact that it doesn't appear that he was eligible for interim relief based on the Yates memorandum... Excuse me, but isn't opposing counsel arguing that there's something fundamentally incompatible with the Yates memo and the 2000 law itself to the extent that the Yates memo would preclude participation in the U visa program to those who have been convicted of aggravated felonies? That's just not compatible with the statute. The statute kind of creates the U visa and sets forth minimum standards of eligibility. I don't think the statute necessarily interprets the standards for a waiver of inadmissibility, for instance. So I agree with you that there is nothing in the statute that per se precludes aggravated felons from obtaining this type of relief. But I think that the Yates memorandum may have been a reasonable proxy for determining whether a waiver of inadmissibility was in the national or public interest. And I would note, with this particular aggravated felony, it's a crime of violence. And so under the current regulations regarding waivers of inadmissibility, and this is mentioned in the Seventh Circuit's Torres Tristan case, there actually have to be extraordinary circumstances. So I agree with you that under the current regulations, there is no per se bar to aggravated felons. But I do think that it's a reasonable enough proxy that in the interim, before the regulations actually came out, it wasn't so unreasonable that it would be obvious, certainly not obvious to an immigration judge. And I don't think that this court has ever held that an immigration judge has an obligation to advise somebody about a potential challenge to a law. And independently, the government would contend that there's insufficient evidence of his eligibility, just as a prerequisite to even seek a U visa, because he would have to get a certification of helpfulness from law enforcement. And I recognize his argument is that he didn't get a certification because he wasn't advised. But even to date, there's no evidence that he sought a certification, and there's no evidence that he ever actually met with any law enforcement agency. His entire claim, you know, rests on this 2000 letter from the U.S. Attorney's Office. And it's my understanding that a series of letters like that were issued as a precautionary measure at the very beginning of the investigation. But that letter doesn't demonstrate that he actually provided helpful information to law enforcement. Do IJs have an obligation to advise people in deportation proceedings of eligibility for the U visa? So, this court has never held that, and the government's made the argument that it appears that the due process right is consistent with the current regulation, which only extends to those forms of relief that the immigration judge can actually grant at the hearing. And I think the logic behind that is that it's direct relief from deportation, and it's somewhat consistent with this court's jurisprudence and the 7th Circuit's jurisprudence on its ability to, on judicial review. So, in Torres-Tristan and Fonseca-Sanchez, the 7th Circuit said we can't consider any aspect of this U visa denial because it's technically collateral to the deportation proceedings. So, your answer is no? That's right. That's the position of the department today? I believe that's correct. Is it correct or not? I want to know your belief. I want to know if you know. I don't know. I mean, this... Well, there is a... Certainly in our office, that was the position, and I think that was the position that the I can't speak to whether it's the overall Department of Justice position. Because even if the IJ couldn't grant the relief himself, he could advise them that this relief was... I mean, I'm thinking of domestic abuse victims. Okay. They could advise them that this relief was available, granted continuance, while the person in proceedings applies to wherever they're supposed to apply to now, Vermont Services or CSIS. Yes, Your Honor. And certainly, there are cases where this court has considered whether an immigration judge abused his discretion by not granting a continuance. So, I guess the government doesn't think it's necessarily inadvisable for an IJ to explore these remedies. I'm just unaware of a case expanding the due process right beyond that regulation. But in this specific case, I don't think the court needs to reach that issue and kind of define the precise contours of the due process right, given that in this particular case, defendant was deported in 2005 before any of these regulations come down. And that also distinguishes this case from the Rosulio case in that, in that particular case, the regulations had already been issued such that perhaps the immigration judge would have been more aware about the potential for UVISA relief. And then as to prejudice, I would just, you know, really ask the court to look at this defendant's criminal history. He had two, and obviously I'm not counting the conviction that was overturned, but he had two convictions for sales transport of controlled substance. One was heroin in 1998. One was cocaine base in 1999. He then serves a significant prison term for that, is ultimately released into immigration custody in 2000, is released on bond from immigration custody in 2001. And just two years later, he is arrested for this assault with a firearm incident, which I wouldn't characterize as a mere bar fight as the PSR reveals that he was holding a handgun and had his finger on the trigger. Counsel, I think what opposing counsel would like us to import into what's fundamentally unfair is how all of this history began for the petitioner in the sense that he was caught up in this ramparts program, was wrongfully accused of a drug offense, convicted of it. All that had to be undone by subsequent proceedings. That's how his path began. How do you respond to that? There is something very troubling about the official involvement by the police and what happened to him. And then we seem to just wash our hands of that as we consider this later history. Yes, Your Honor. Absolutely. I would just, if you look at that precise timeline of events, it's not entirely clear what the effect of that arrest actually had on his overall history. And I would just note that he initially gets a diversionary sentence in connection with that conviction that's ultimately overturned. Just two months later, he's arrested on another controlled substance offense. And just two months after that, he's arrested on a controlled substance offense, which results in a new conviction. So I obviously can't 100% say that they weren't related. That may very well have caused him to develop a drug problem. But these are convictions that are very shortly after that initial offense. And they're not just possession offenses. They're sale transport offenses. So I understand Your Honor's concern. But I would still say that in light of the seriousness and recency of his criminal history, it would not be plausible that he'd obtain a waiver of any disability. Thank you, Counsel. There's some time left. Thank you, Your Honor. Just briefly, Judge Maguria asked about the status of the investigation. And it's not clear that it was over at the time of the deportation proceedings. But I think it's irrelevant because the statute speaks in the past tense as well as the present and future tense. It talks about an immigrant who has been helpful. And there's no doubt in this record that he was helpful. And the statute is not just intended to help the government prosecute victims. It's also intended to assist victims in the humanitarian interest of the United States. And that's why I'm focusing on the fact that, as Judge Lopez pointed out, Mr. Lopez had a law-abiding life until this happened. And so it's in the humanitarian interest of the United States to look at that and to look at the damage that was done to him. And the fact that the statute, the act, the Victims Act, according to the expert in Resilio, has one of the most forgiving statutes, forgiving provisions for relief of criminal backgrounds. And even people with criminal records get relief under the statute and get U-Visas because the purpose of the statute is humanitarian. Thank you, Your Honors. Right. Thank you very much. United States v. Lopez. Our file will be submitted.
judges: Lipez, Wardlaw, Murguia